J-A15025-21

2022 PA Super 190

| ERIC TOPPY | | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | Appellant | |
| | v. | |
| PASSAGE BIO, INC. | | |
| | Appellee | No. 24 EDA 2021 |

Appeal from the Order Entered November 25, 2020
In the Court of Common Pleas of Philadelphia County
Civil Division at No: 200400905

BEFORE:  BOWES, J., STABILE, J., and MUSMANNO, J.

OPINION BY STABILE, J.:                    **FILED NOVEMBER 9, 2022**

In this employment dispute, Appellant, Eric Toppy, filed a five-count complaint against Appellee, Passage Bio, Inc., alleging that Appellee breached a settlement agreement that resolved Appellant's wrongful termination claims against Appellee.  Appellee filed preliminary objections in the nature of demurrers asserting, *inter alia*, that the parties never entered a binding settlement agreement.  The trial court sustained Appellee's preliminary objections and dismissed the complaint with prejudice.  Appellant appeals from the order of dismissal.  We affirm in part and reverse in part.  We reverse the dismissal of Appellant's claims for breach of the settlement agreement and violation of the Wage Payment Collection Law ("WPCL"), 43 P.S. §§ 260.1—260.13.  We affirm the dismissal of Appellant's claims for unjust enrichment, fraudulent misrepresentation and negligent misrepresentation.

Appellant's complaint alleges the following. Appellee is an emerging growth company engaged in the development of gene therapies for the treatment of rare central nervous system diseases. In April 2019, based on his prior employment in the health care industry and his relationships with rare disease patient organizations, Appellee hired Appellant as Vice President of Patient Engagement and Market Access. As compensation, Appellee agreed to pay Appellant an annual salary of $260,000 and a bonus targeted at 25% of his base salary. Appellee also granted Appellant 448,623 stock options which were to vest over the ensuing four years.

In October 2019, while Appellant was on a business trip for Appellee in Europe, Appellant's supervisor, Ms. Quigley, sent Appellant an e-mail stating that she intended to terminate his employment. On his return, Appellant met with Appellee's general counsel, who told him that his employment was at an end effective October 25, 2019. Having consulted and retained counsel, Appellant then asserted[1] three employment-related claims for relief against Appellee: (1) disability discrimination; (2) misrepresentation related to the forfeiture of the 448,623 stock options he had been granted; and (3) defamation related to pejorative comments that Quigley made about him to third parties.

---

[1] Although the complaint is not clear on this point, it appears from context that Appellant first asserted these claims in private correspondence to Appellee as opposed to the filing of a civil action in the court of common pleas.

- 2 -

Appellant and Appellee agreed to mediate his claims before Patricia McInerney, a former common pleas judge. Complaint, ¶¶ 2, 4. On January 30, 2020, the mediation took place. *Id.* at ¶ 25. The parties reached agreement on two of the three settlement terms that Appellant proposed, namely payment by Appellee of eight months of Appellant's annual salary and a 25% bonus pro-rated for eight months. *Id.* at ¶ 26. What remained unresolved was the number of shares of common stock Appellee agreed to issue to Appellant in exchange for his 448,623 stock options.[2] *Id.* at ¶ 27. Settlement negotiations continued over the weekend regarding the number of shares of stock to be issued to Appellant. *Id.* at ¶ 28. On Monday, February 3, 2020, Appellee agreed to issue Appellant 150,000 shares of common stock. *Id.*

On February 3, 2020, Judge McInerney sent an e-mail to Appellant's counsel, Harold Goodman that stated as follows:

> I just got out of a meeting and Susan has replied accepting your proposal:
>
> > I just heard back from my client. They agree to the terms [Appellant's counsel] suggested (150,000

_____

[2] While stock options "take many forms and have assorted conditions," ***Marchlen v. Township of Mt. Lebanon***, 746 A.2d 566, 570 n.9 (Pa. 2000), a stock option is, generally speaking, a benefit given by a company to an employee to purchase company stock at a discount or fixed price. Stock shares, on the other hand, represent fractional ownership of an issuing company. ***Guarantee Trust and Safe Deposit Co. of Mt. Carmel v. Tye***, 196 A. 618, 620 (Pa. Super. 1938) (share of stock in business corporation is "one of the whole number of equal parts into which the capital stock of a trading company or corporation is or may be divided").

shares, 8 months' severance, 25% bonus pro-rated for 8 months, etc.), with two small tweaks:

1. They want to add Lysogene to the list of companies where [Appellant] cannot work (the others are Axovant and Prevail Therapeutics).

2. Regarding the letter of reference, Steve Squinto is willing to state something like Eric's role changed and he wanted to leave so that he could continue to work in patient engagement. He does not want to address Eric's performance as he did not supervise Eric and obviously, Eric's supervisor was critical of his performance.

They also wanted me to make clear that this is their final position.

*Id.*, ex. 1. Nothing in this email stated or suggested that the stock would be subject to a pre-IPO (initial public offering) reverse stock split. The complaint alleged that the email constituted an agreement because it resolved the final issue between the parties. *Id.* at ¶ 28 ("Following discussions over the weekend, the parties reached agreement on that remaining issue [the number of shares of common stock]. Specifically, as reflected in the attached Monday, February 3, 2020 e-mail from Judge McInerney, [Appellee] agreed with [Appellant's] counsel to issue him 150,000 shares of its Common Stock").

On February 12, 2020, counsel for Appellee sent Appellant's counsel a draft settlement agreement and release to review. The draft accurately described the severance and bonus payments that Appellant would receive. The draft stated that Appellee would issue Appellant 150,000 shares of its Common Stock, but it added in a vague parenthesis that the number "may be adjusted by stock splits, stock combinations, recapitalizations or the like." *Id.*

at ¶ 31.  Unbeknownst to Appellant at that time, Appellee already intended to authorize a pre-IPO reverse split[3] of its common stock.  *Id.* at ¶ 32.  Appellee was aware of this internal decision at the time of the mediation before Judge McInerney (January 30, 2020) and on the day it agreed to issue Appellant 150,000 shares of its common stock (February 3, 2020).  *Id.* at ¶ 33.  Despite that, Appellee never said anything to Appellant about the reverse stock split until more than two weeks later.  *Id.* at ¶ 34.  On February 18, 2020, counsel for Appellee informed Appellant's counsel that four days earlier (February 14, 2020), Appellee's Board of Directors had met and authorized a 4.43316 reverse split of its common stock.  *Id.*  No notice of that meeting was sent to Appellant or his counsel.  *Id.* at ¶ 36.  In effect, without Appellant's agreement, Appellee unilaterally decided to reduce the agreed upon shares of common stock to be issued to Appellant from 150,000 to 33,836 shares.  *Id.* at ¶ 34.  This occurred after the parties already agreed to issue Appellant 150,000 shares in exchange for his 448,623 stock options, or approximately 33% of the options.

Appellant refused to sign the draft settlement agreement that Appellee sent to Appellant's counsel on February 12, 2020.  Appellee's Brief at 5.

In an initial public offering on February 28, 2020, Appellee's stock opened on the NASDAQ Exchange at $18.00 per share.  *Id.* at ¶ 41.  Based

---

[3]  A reverse stock split is one whereby existing shares of stock are merged to create a smaller number of proportionally more valuable shares. Consequently, the price per share increases proportionally.

on this opening share price, the difference between the value of 150,000 shares of Appellee's common stock and 33,836 shares is in excess of $2 million. *Id.* at ¶ 44.

Appellant requested that Appellee comply with the terms of the agreement that Appellant envisioned: payment of eight months of salary, a 25% bonus pro-rated for eight months, and distribution of 150,000 shares of common stock to Appellant. Appellee refused. Appellant thereupon commenced the present action by filing a five-count complaint against Appellee. Count I alleged that Appellee breached the parties' settlement agreement and requested "enforcement in full of the parties February 3, 2020 settlement agreement, including payment of the severance and bonus he is due, and an injunction compelling Passage Bio to issue him 150,000 shares of its Common Stock." Count I, Prayer for Relief. Counts II and III alleged claims for intentional and negligent misrepresentation against Appellee based on its failure to disclose its reverse stock split to Appellant. Count IV asserted a claim for unjust enrichment. Count V alleged a claim for violation of the WPCL.

Appellee filed preliminary objections to the complaint in the nature of demurrers. Appellee's sole basis for demurrer to Appellant's claim for breach of the settlement agreement was that Appellant repudiated the settlement agreement, and thus could not enforce it, because he raised claims for intentional and negligent misrepresentation in Counts II and III of his complaint. Appellee "dispute[d] that the parties ever entered into an

- 6 -

enforceable contract," but for purposes of its preliminary objections, it "accept[ed] as true" what it called the "factual allegation[]" that "an enforceable contract was formed." Appellee's Memorandum In Support Of Preliminary Objections to Complaint, at 7 n.4.[4]

Appellant filed a timely answer to the preliminary objections, and Appellee filed a reply brief in support of its preliminary objections.

In a November 24, 2020 memorandum and order, the trial court sustained Appellee's preliminary objections and dismissed the complaint in its entirety. This timely appeal followed. The trial court did not order Appellant to file a Pa.R.A.P. 1925 statement of matters complained of on appeal.

Appellant raises the following issues in this appeal:

I. In sustaining [Appellee's] preliminary objection and dismissing [Appellant's] claim for breach of the parties' settlement agreement, did the trial court commit reversible error by:

A. ignoring [Appellee's] concessions that the parties *did* enter into a binding settlement agreement;

B. disregarding the allegations in the Complaint that the parties *did* reach an enforceable settlement agreement;

C. misconstruing the mediator's e-mail (Exh. 1 to the Complaint) regarding the substance of the parties' settlement agreement?

---

[4] Appellee made a similar statement in its reply brief in support of its preliminary objections. Reply Brief in Support of Appellee's Preliminary Objections to Complaint, at 2 ("Passage Bio . . . is not contesting the assertion that the parties reached agreement on the material terms of a settlement agreement").

II. In sustaining [Appellee's] preliminary objection and dismissing [Appellant's] claim for unjust enrichment, did the trial court commit reversible error by:

A. failing to recognize that a claim for unjust enrichment is a judicially recognized alternative to one for breach of contract; and

B. disregarding the allegations in the Complaint that [Appellee] wrongfully secured a general release of claims from [Appellant] while unjustly retaining all of the payments and shares of Common Stock it agreed to provide him?

III. In sustaining [Appellee's] preliminary objections and dismissing [Appellant's] claims for intentional and negligent misrepresentation, did the trial court commit reversible error by disregarding the allegations in the Complaint that [Appellee] concealed from [Appellant] its intention to implement a pre-IPO reverse split of its Common Stock that would dilute the number of shares it agreed to issue to him from 150,000 to 33,836 shares?

IV. In sustaining [Appellee's] preliminary objection and dismissing [Appellant's] claim for violation of Pennsylvania's Wage Payment and Collection Law ("WPCL"), did the trial court commit reversible error by:

A. relying on its mistaken view that [Appellant] failed to plead sufficient facts to support his claim for an enforceable settlement agreement; and

B. concluding that the 150,000 shares of Common Stock were not "wages" under the WPCL?

Appellant's Brief at 5-6.

This Court reviews an order sustaining preliminary objections for an error of law, and in so doing, it must apply the same standard as the trial court. *Sayers v. Heritage Valley Medical Group, Inc.*, 247 A.3d 1155, 1160-61 (Pa. Super. 2021). Preliminary objections in the nature of a demurrer

- 8 -

test the legal sufficiency of the complaint. When considering preliminary objections, all material facts set forth in the challenged pleadings are admitted as true, as well as all inferences reasonably deducible therefrom. Preliminary objections which seek the dismissal of a cause of action should be sustained only in cases in which it is clear and free from doubt that the pleader will be unable to prove facts legally sufficient to establish the right to relief. If any doubt exists as to whether a demurrer should be sustained, it should be resolved in favor of overruling the preliminary objections.

*Id.* at 1161.

In his first argument, Appellant contends that the trial court erred by dismissing the first count in his complaint, a claim that Appellee breached the settlement agreement by refusing to issue 150,000 shares of its common stock to Appellant. We agree that the trial court erred by dismissing this count.

The trial court's analysis on this issue was as follows:

Judge McInerney's February 3, 2020 email records an incomplete agreement, one that was almost there—but not quite. Appellant's offer to release [Appellee] included the idea of [Appellant] receiving 150,000 shares of stock. This was generally acceptable to [Appellee], but with "two small tweaks." These tweaks are not defined in Judge McInerney's email and they turn out to be substantive when revealed in [Appellee's] complete draft Settlement Agreement. These "two small tweaks" go to the heart of how the respective parties monetarily valued "150,000 shares," and they have disagreed.

And also, without an agreed date on which the value of the shares were to be measured, the essential term defining consideration was neither final nor enforceable.

In this situation, [Appellee's] February 12, 2020 draft Settlement Agreement amounts to a counter-offer which has not—to date—been accepted.

Trial Court Memorandum Opinion, 11/24/20, at 5.

We believe two preliminary maters warrant comment before we address the merits of the trial court's analysis.

First, all points in the above-recited passage were raised by the trial court *sua sponte*; Appellee did not raise any of these points in its preliminary objections or in its reply brief in support of preliminary objections. This Court has held that trial courts should not dismiss actions based on grounds not raised by the parties. ***MacGregor v. Mediq Inc.***, 576 A.2d 1123, 1127-28 (Pa. Super. 1990) (trial court erred by sustaining preliminary objections and dismissing complaint by *sua sponte* raising immunity issue that defendant did not raise; "the preliminary objections raised only the questions regarding the Rule 1020 defect and whether the averred facts supported a claim for emotional distress and punitive damages. Under the Rules and the case law, it is clear that matters not raised in preliminary objections may not be considered by the court *sua sponte*"). Appellant, however, did not object to the trial court's decision to dismiss his claim for reasons not raised by Appellee. Since Appellant failed to make a ***MacGregor*** argument, we do not address whether to vacate the decision on this basis.

On the other hand, because of the *sua sponte* nature of the trial court's decision, and because the trial court did not order Appellant to file a Pa.R.A.P. 1925 statement, this appeal is the first opportunity for Appellant to object to the issues raised in the trial court's memorandum opinion. Appellant availed himself of this opportunity in his appellate briefs. Consequently, we will review

the merits of the arguments raised by Appellant in opposition to the trial court's decision. *See*, *e.g.*, *DiGregorio v. Keystone Health Plan East*, 803 A.2d 361, 366 (Pa. Super. 2003) (plaintiffs' claim that trial court violated coordinate jurisdiction rule of law of the case doctrine by granting defendant's purported motion to dismiss on morning of trial was not waived by failure to raise it on the record before the trial court; plaintiffs raised the issue at their first opportunity in their concise statement of matters complained of on appeal, and court's decision, whether judgment on the pleadings or summary judgment, denied plaintiffs an opportunity to preserve issue in written response).

Second, Appellant argues that Appellee is bound by its "judicial admissions" in the trial court and that for purposes of its preliminary objections, it accepted that the parties entered into a binding settlement agreement. Appellant's Brief at 23-24 (citing Appellee's memoranda in support of preliminary objections). We disagree. Judicial admissions "apply only to disputed facts[] and are exclusive of legal theories and conclusions of law." *Nicholas v. Hoffman*, 158 A.3d 675, 696 (Pa. Super. 2017). The existence of a contract is a conclusion of law, not a disputed fact. *Delaware River Preservation Co., Inc. v. Miskin*, 923 A.2d 1177, 1182 (Pa. Super. 2007) (question of whether valid contract has been formed is generally one of law for court to decide). Thus, Appellee's acceptance of a contract for purposes of preliminary objections does not constitute a judicial admission.

Proceeding to the merits of this appeal, we consider that the substance of Appellant's first issue is that the parties entered a valid and enforceable settlement agreement through Judge McInerney's February 3, 2020 email and Appellant's acceptance of the two "tweaks" therein. The enforceability of settlement agreements

> is determined according to principles of contract law. Because contract interpretation is a question of law, this Court is not bound by the trial court's interpretation. Our standard of review over questions of law is *de novo* and to the extent necessary, the scope of our review is plenary as [the appellate] court may review the entire record in making its decision.

*Mastroni–Mucker v. Allstate Ins. Co.*, 976 A.2d 510, 517–18 (Pa. Super. 2009).

Like any contract, to be enforceable, a settlement agreement must possess all the elements of a valid contract: offer, acceptance, and consideration. *Muhammad v. Strassburger, McKenna, Messer, Shilobod & Gutnick*, 587 A.2d 1346, 1349 (Pa. 1991). "[I]t is essential to the enforceability of a settlement agreement that the minds of the parties should meet upon all the terms, as well as the subject matter, of the agreement." *Mazzella v. Koken*, 739 A.2d 531, 536 (Pa. 1999). "An alleged acceptance of an offer is not unconditional and, therefore, is not an 'acceptance' if it materially alters the terms of the offer." *Yarnall v. Almy*, 703 A.2d 535, 539 (Pa. Super. 1997). "As such, a reply which purports to accept an offer, but instead changes the terms of the offer, is not an acceptance, but, rather, is a counter-offer, which has the effect of terminating the original offer." *Id.*

"When the evidence is in conflict as to whether the parties intended that a particular writing should constitute an enforceable contract, it is a question of fact whether a contract exists." *Yellow Run Coal Co. v. Alma-Elly-Yv Mines, Ltd.,* 426 A.2d 1152, 1154 (Pa. Super. 1981).

Of significance, "[i]f the parties have agreed on the essential terms, the contract is enforceable even though it is an informal memorandum requiring future approval or negotiations of incidental terms." *Id.* at 1155. Indeed, courts also will enforce informal agreements that are missing "material" terms so long as the parties agree on the essential terms. *Field v. Golden Triangle Broad, Inc.*, 305 A.2d 689, 694 (Pa. 1973); *Bredt v. Bredt*, 326 A.2d 446, 449 (Pa. Super. 1974). In *Field*, a party who sought to purchase two radio stations wrote a letter in the form of a preliminary memorandum stating the parties' agreement on price and terms for financing. The letter stated that it was "(s)ubject to agreement on a formal contract," and it did not specify a date for settlement or set a deadline for approval by the Federal Communications Commission. Our Supreme Court held that the letter was an enforceable contract:

> Appellant also urges that "many other" material terms and conditions that are customarily included in a contract for sale of a going concern are absent from the . . . letter agreement. However, the fact that additional provisions would enhance the position of both parties is not controlling. What is necessary is that the parties agree to all the essential terms and intend the letter to be binding upon them. We believe that the letter agreement in question manifests such agreement and intention.

- 13 -

*Id.*, 305 A.2d at 694. Subsequently, in **Bredt**, the parties reached a verbal agreement in open court in a support action. The court and counsel referred to the "agreement" between the parties. *Id.*, 326 A.2d at 449. At the conclusion of the hearing, the husband's attorney stated that the "agreement itself will have to be formalized." *Id.* The court entered an order finding that the parties entered into a binding agreement in open court. Citing **Field**, this Court affirmed, stating, "The fact that the parties intended to formalize their agreement at some later date or omitted some material terms and conditions therefrom is not controlling as long as the parties agreed to all the essential terms and intended the contract to be binding upon them." *Id.*

**Mastroni-Mucker** provides another useful illustration of a settlement agreement that constitutes an enforceable contract despite the absence of a formalized agreement. There, during trial, counsel for the parties stated on the record that the plaintiffs accepted a $60,000 settlement offer from the defendants in exchange for a general release of claims. The defendants later reneged on the settlement, contending that it was conditioned on the parties' approval of a particular form of release. This Court held that the on-the-record agreement constituted an enforceable contract because it contained an offer, acceptance, and consideration and counsel for the defendants never expressed that the scope of the release was in dispute. *Id.*, 976 A.2d at 523.

Of note, in a case with analogous facts, the New York Court of Appeals held that plaintiffs, who had entered stock option agreements with a corporation, had the right to exercise their options without adjustment for the

corporation's post-agreement reverse stock split. *Reiss v. Fin. Performance Corp.,* 764 N.E.2d 958 (N.Y. 2001). The Court of Appeals observed that one month before the stock option agreements with the plaintiffs, the corporation had agreed to a stock option agreement with a third person that in fact required adjustment in the event of a reverse stock split. *Id.* at 959-60. Thus, the omission of an adjustment provision from the plaintiffs' agreements indicated that the parties did not intend for any adjustment in the event of a post-agreement reverse stock split. *Id.* at 961. Although we are not bound by decisions from other jurisdictions, we regard this ruling as persuasive authority on the point whether Appellee's omission to inform Appellant of a possible reverse stock split at the time settlement was reached should now affect the number of common shares agreed upon to be issued to Appellant. *Farese v. Robinson*, 222 A.3d 1173, 1188 (Pa. Super. 2019) (although Superior Court is not bound by decisions from courts in other jurisdictions, we may use such decisions for guidance to degree we find them useful, persuasive, and not incompatible with Pennsylvania law).

In this case, the complaint alleges that the parties agreed to mediate claims that Appellant planned to file against Appellee relating to the termination of his employment. During the mediation, Appellant proposed three terms for settling the dispute. Appellee agreed to two of these terms during the mediation. The third term proposed by Appellant was that Appellee would issue him 150,000 shares of common stock in exchange for the 448,623 stock options given to Appellant during his employment. Following the

- 15 -

mediation, the mediator sent an email to Appellant's attorney stating that Appellee agreed to all three terms: eight months of severance pay, a bonus, and 150,000 shares of common stock. The email added that Appellee agreed to these terms with "two small tweaks": (1) Appellant could not work for another entity named Lysogene, and (2) Steve Squinto's letter of reference would be modified as to the reason why Appellant was terminated. Neither of these tweaks affected agreement upon the term promising Appellant 150,000 shares of common stock. One week later, Appellee sent a formal settlement agreement to Appellant that purported to change the nature of stock to be issued, but Appellant did not sign it. On February 14, 2020, Appellee's Board of Directors authorized a reverse stock split that would reduce the 150,000 shares promised to Appellant to 33,836 shares. Appellee planned this reverse stock split prior to Appellant's mediation but did not inform Appellant about the split until February 18, 2020, four days after the Board of Directors authorized the split and fifteen days after the mediator related to Appellant on February 3, 2020, Appellee's agreement to issue 150,000 shares to Appellant. On February 28, 2020, Appellee's initial public offering of its stock took place on the NASDAQ exchange.

The allegations in the complaint, accepted as true, and the inferences reasonably deducible therefrom, state a cause of action against Appellee for breaching a settlement agreement that it entered with Appellant on February 3, 2020. Appellant offered to settle the dispute in consideration for three terms. Appellee accepted two of these terms during the mediation, and the

- 16 -

mediator's February 3, 2020 email constituted Appellee's acceptance of the third term. Thus, the averments of the complaint support that the parties reached a meeting of the minds on all essential terms. The two additional terms in the email that Appellant would not work at Lysogene and Steve Squinto would modify his letter of reference for Appellant, were immaterial, since the email characterized them as mere "tweaks." Therefore, those terms did not constitute a counteroffer that nullified Appellant's offer. Second, it is apparent, and we can infer from the complaint, that Appellant immediately accepted these minor "tweaks," given the complaint's repeated references to the "February 3, 2020 agreement," Complaint at ¶¶ 34, 35, the "agreement that [Appellant] and [Appellee] reached on February 3, 2020," *id.* at ¶ 49, and "February 3, 2020[,] when the case settled," *id.* at ¶ 33.[5]

Under the precedents discussed above, *see Field*, *Bredt*, *Mastroni-Mucker*, the fact that the agreement was informal instead of a signed formal release does not render it unenforceable, because the essential terms of the agreement were spelled out in the February 3, 2020 email. In particular, the

_____

[5] In arriving at this inference, we do not take into account Appellant's response to Appellee's preliminary objections in the trial court, in which Appellant asserted that he accepted the tweaks. Appellant's Memorandum Of Law In Opposition To Appellee's Preliminary Objections, at 13 n.1. Nor do we take into account Appellant's assertion in this Court that states that he approved the tweaks on February 4, 2020, one day after the mediator's email. Appellant's Brief at 13 n.1. We cannot take these statements into consideration because they do not appear in Appellant's complaint. *Sayers*, 247 A.3d at 1161 (review of demurrer in preliminary objections limited to challenged pleading). Reasonable inferences, however, may be acknowledged.

term that Appellant would receive 150,000 shares of Appellee's common stock was essential in order to provide an adequate exchange for the 448,623 stock options and add sufficient value to Appellant's settlement package. The complaint also satisfactorily alleges that Appellee breached the agreement by reducing the number of shares by 75 percent by a reverse stock split, an act that Appellee planned prior to settlement negotiations.

The trial court concluded that the complaint failed to state a claim because the parties did not agree on the price of the common stock shares or their date of valuation. In this regard, the trial court misconstrues the agreement reached between the parties as pled in the complaint. The parties agreed to a *quantity* of stock to be issued in place of the stock options, not to a *value* that would be paid in stock. The complaint buttresses why the parties negotiated a quantity of stock as opposed to a value to be paid in stock. The complaint alleges that Appellee's initial public offering of its common stock took place several weeks after the parties reached their settlement agreement. The inference arises that the parties did not negotiate a price because they intended the market price of the shares to determine their value. For the same reason, it was not necessary for the parties to define a date of valuation for the shares.

We therefore must disagree with the trial court's conclusion that the parties did not reach an agreement because the mediator's email did not define the "two small tweaks" remaining for negotiation and the parties failed to resolve them. The email explicitly identified the two "tweaks" as (1)

- 18 -

Appellant would not work for Lysogene and (2) a revision to the scope of Squinto's letter of reference. Further, as discussed above, we infer from the allegations in the complaint that Appellant accepted the tweaks. In addition, we disagree with the trial court's claim that these tweaks "go to the heart of how the respective parties monetarily valued '150,000 shares' [of Appellee's common stock]." Trial Ct. Op. at 5. These subjects appear to concern where Appellant will work in the future and the content of the reference that Squinto will send to prospective employers, subjects entirely unrelated to the valuation of the shares. The trial court simply was mistaken as to the importance these tweaks had to the settlement agreement.

Appellee argued in the trial court, and continues to argue here, that Appellant cannot pursue a claim for breach of the settlement agreement because he rescinded this claim by asserting counts for intentional and negligent misrepresentation in the complaint. The trial court did not address this issue in its opinion and order dismissing Appellant's action.

We disagree with Appellee's argument for several reasons. First, the law is clear that parties may plead and pursue alternative causes of action but are limited to a recovery of damages under a single theory. Our Supreme Court recently stated:

> [O]ur Rules of Civil Procedure expressly allow the pleading of alternative causes of action, see Pa.R.C.P. 1020(c), and further permit liberal amendment of pleadings in order to secure a proper determination of the merits . . . Accordingly, a party may generally simultaneously plead and attempt to prove alternative causes of action seeking damages through inconsistent remedies supported

by the same factual scenario . . . . However, the substantive application of the election of remedies doctrine operates to bar windfall judgments or otherwise duplicative recoveries resulting from a single injury; although such inconsistent remedies may be pleaded and pursued in litigation, damages calculated pursuant to only one theory may be recovered.

*Gamesa Energy USA, LLC v. Ten Penn Center Associates, L.P.*, 217 A.3d 1227, 1239 (Pa. 2019). Therefore, Appellant has the right to plead and pursue claims of misrepresentation as well as a claim for breach of the settlement agreement. He cannot recover damages for the same injury, however, under more than one theory.

Appellee relies on *Smith v. Brink,* 561 A.2d 1253 (Pa. Super. 1989), and *Devore v. City of Philadelphia*, 2005 WL 352698 (E.D.Pa. 2005), for the proposition that Appellant rescinded the settlement agreement by alleging claims of misrepresentation in his complaint. *Smith* is not controlling. There, the plaintiff sued two police officers in federal court under 42 U.S.C. § 1983 for an alleged illegal arrest. The parties entered a settlement, but the defendants reneged on the agreement. Instead of seeking to enforce the settlement, the plaintiff proceeded to litigate their Section 1983 claims, which resulted in a defense verdict. After losing the verdict, the plaintiff filed a separate action in the Court of Common Pleas of Dauphin County seeking to enforce the settlement. The Dauphin County court dismissed this action, and we affirmed, reasoning:

> [The plaintiff] fully litigated his federal tort suit to a final verdict in favor of the appellees. Therefore, the present suit must fail for want of consideration since the settlement was based in part upon

the existence of [the plaintiff's] federal action.  Moreover, [his] decision to forego litigation on the breach of contract action until after the final resolution of [his] tort claim acted, in effect, as a repudiation of the alleged settlement agreement.

*Id.*, 561 A.2d at 1256.  We also stated that

when a settlement contract is breached, the plaintiff has two coexistent but inconsistent remedies available: he may treat the compromise agreement as rescinded and sue on the original tort, or he may sue on the contract.  The plaintiff may not, however, prosecute one of these remedies to judgement and then sue on the other.

*Id.* (citing **Burrus v. American Casualty**, 518 F.2d 1267, 1269 (7th Cir. 1975)).

**Smith** does not support Appellee's argument that Appellant rescinded the settlement agreement by merely alleging tort claims in the complaint. **Smith** held that the plaintiff therein could not sue for breach of the settlement agreement because he tried to take two bites at the apple—he **first** prosecuted his tort claims to verdict and **then,** displeased with the verdict, sued for breach of the settlement agreement.  The present case is different. Appellant did not prosecute his original claims to judgment before seeking to enforce his settlement agreement.  Indeed, it does not appear that he has ever filed a lawsuit alleging his original claims prior to the instant action.  All claims in Appellant's present action relate to the settlement agreement. Count I seeks to enforce the settlement agreement; Count II, a claim of unjust enrichment, seeks damages for benefits allegedly conferred upon Appellee through the settlement agreement; Counts III and IV demand damages for

alleged misrepresentations during and after settlement negotiations; Count V, a claim under the WPCL, seeks damages for breach of the settlement agreement. No claim in the complaint relates to Appellant's original claims of discrimination, wrongful forfeiture of stock options or defamation. Nor do any claims in the complaint rescind the settlement agreement. This case is Appellant's first bite at the apple, not his second.

*Devore* also is inapposite. There, following a verdict in favor of the plaintiff in an employment dispute, the parties settled the plaintiff's underlying claims while post-verdict motions were pending. The defendant then failed to comply with the settlement. In response, the trial judge offered the plaintiff one of two options: (1) file a separate action to enforce the settlement, or (2) vacate the settlement and reinstate the pre-settlement verdict. The plaintiff chose to reinstate the verdict but then filed a separate action to enforce the settlement. Similar to *Smith*, the court precluded the separate action on the ground that the plaintiff could not take two bites at the apple; he could not both retain his verdict and enforce his settlement. Unlike the plaintiff in *Devore*, Appellant does not seek recovery on both the settlement agreement and his original claims. Appellant merely seeks remedies relating to the settlement agreement.

We conclude today only that the allegations of the complaint, accepted as true for the purpose of evaluating Appellee's preliminary objections, set

forth a valid action for breach of contract.[6]  Therefore, the trial court erred in sustaining Appellee's preliminary objection to Count I of the complaint, and we remand for further proceedings on this count.

In his second issue, Appellant contends that the trial court erred by dismissing his claim of unjust enrichment in Count IV of the complaint.  We affirm the dismissal of this count.

A claim for unjust enrichment arises from a quasi-contract.  ***Gutteridge v. J3 Energy Grp., Inc.***, 165 A.3d 908, 916 (Pa. Super. 2017).  "A quasi-contract imposes a duty, not as a result of any agreement, whether express or implied, but in spite of the absence of an agreement, when one party receives unjust enrichment at the expense of another."  ***Id.***  "The elements of unjust enrichment are benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value."  ***Id.***  "Critically, the doctrine of unjust enrichment is inapplicable when the relationship between parties is founded upon a written agreement or express contract."  ***Wilson v. Parker***, 227 A.3d 343, 353 (Pa. Super. 2020).

---

[6] Our decision today is limited to reviewing the trial court's disposition of preliminary objections, does not foreclose the parties from developing all factual issues in the parties' dealings during later stages of this case, including but not limited to whether they arrived at an agreement, how they arrived at the agreement, the terms of the agreement and whether any ambiguity exists in the agreement.

In ***Khawaja v. RE/MAX Central***, 151 A.3d 626 (Pa. Super. 2016), the plaintiff, Khawaja, filed an action alleging breach of a written contract and unjust enrichment. The defendant filed preliminary objections arguing that the plaintiff failed to state a cause of action. The trial court sustained the defendant's preliminary objections and dismissed the complaint in its entirety. This Court reversed the trial court's decision to dismiss the breach of contract claim and remanded for further proceedings on this claim. We then affirmed the dismissal of the unjust enrichment claim, reasoning:

> A claim sounding in breach of contract may be pleaded alternatively with a claim of unjust enrichment if the claims are raised in separate counts of a complaint. ***Lugo v. Farmers Pride, Inc.***, 967 A.2d 963, 970 (Pa. Super. 2009). However, the fact remains that "[a] cause of action for unjust enrichment arises only when a transaction is not subject to a written or express contract," ***Northeast Fence & Iron Works, Inc. v. Murphy Quigley Co.***, 933 A.2d 664, 669 (Pa. Super. 2007). Khawaja argues that the trial court's rejection of her claim based on the Agreement meant that her unjust enrichment claim should have been permitted to proceed . . . But because we have reversed the dismissal of Khawaja's contract claim, this argument no longer has any force. Khawaja's complaint alleged unjust enrichment in her second count, which incorporated by reference the facts pled in Count I, her breach of contract count . . . Her unjust enrichment count thus averred the existence and terms of the signed Agreement. Because a claim for unjust enrichment cannot stand when there is an express contract and because Khawaja's allegations in this regard are based on the terms of such a contract, we affirm the trial court's dismissal of Khawaja's unjust enrichment claim.

***Id.***, 151 A.3d at 633-34.

The same reasoning applies here. We have vacated the dismissal of Appellant's claim for breach of the settlement agreement in Count I, a claim of an express contract. Appellant's claim for unjust enrichment in Count IV

incorporates by reference the factual allegations pled in Count I. Complaint, at ¶ 65. Thus, Appellant's unjust enrichment claim avers the existence and terms of the settlement agreement. Because an unjust enrichment claim cannot stand when there is an express contract, and because Appellant's allegations of unjust enrichment are based on the terms of such a contract, we affirm the dismissal of his unjust enrichment claim.

In his third issue, Appellant maintains that the trial court erred by dismissing his claims for intentional and negligent misrepresentations. We disagree.

In a non-disclosure case, the tort of intentional misrepresentation requires proof of: (1) concealment; (2) which is material; (3) with the intent of misleading another into reliance upon the material omission; (4) justifiable reliance on the material omission; and (5) resulting injury caused by the reliance. *Bortz v. Noon*, 729 A.2d 555, 560-61 (Pa. 1999). Negligent misrepresentation requires proof of: (1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation. *Id.* at 561.

In the trial court, Appellee argued in its preliminary objections that the complaint failed to allege that Appellant relied to his detriment upon any misrepresentation. The trial court agreed, reasoning that "[Appellant] never

released [Appellee] and therefore cannot show he relied on a misrepresentation to do anything detrimental to his interests." Trial Ct. Op. at 6. We too agree with Appellee. The complaint does not allege that Appellant took any action to his detriment as a result of Appellee's concealment of its intent to perform a reverse stock split. The complaint alleges that when Appellant entered into a settlement agreement with Appellee on February 3, 2020, Appellee allegedly harbored the intent to perform a reverse stock split. On February 14, 2020, Appellee performed the reverse stock split, lowering the number of Appellant's shares from 150,000 (the number of shares in the settlement agreement) to 33,836 shares. On February 28, 2020, the initial public offering of Appellee's stock took place. Appellant's complaint seeks to enforce the promise in the settlement agreement to provide him with 150,000 shares. These allegations do not demonstrate that Appellant took any action to his own detriment. Appellant did not act to his own detriment by entering the alleged February 3, 2020 settlement agreement. To the contrary, the agreement is beneficial to him because it gives him 150,000 shares. Indeed, Appellant regards this agreement as beneficial because he is attempting to enforce it in this action. Nor did Appellant act to his own detriment in response to the release that Appellee sent on February 12, 2020, since Appellant never signed the release. Lastly, Appellant did not act to his own detriment after Appellee performed the reverse stock split and its initial public offering. The only act that Appellant

took in response was to prosecute this lawsuit, an act that in no way constitutes detrimental reliance on any conduct by Appellee.

For these reasons, we affirm the dismissal of the counts in Appellant's complaint for intentional or negligent misrepresentation.

In his final issue, Appellant contends that the trial court erred in dismissing his claim for relief under the WPCL in Count V of the complaint. According to the complaint, Appellee promised to pay 448,623 stock options to Appellant in the parties' original April 2019 agreement. Subsequently, in the February 3, 2020 agreement, Appellee promised to issue 150,000 shares of stock to Appellant in consideration of his stock options. The complaint alleges that Appellee breached the WPCL by failing to pay the stock shares promised in the February 3, 2020 agreement. Complaint, ¶¶ 71-75. We hold that Appellant states a valid claim under the WPCL for Appellee's refusal to pay the stock shares.

> The legislature enacted the WPCL
>
> to provide a vehicle for employees to enforce payment of their wages and compensation held by their employers. The underlying purpose of the WPCL is to remove some of the obstacles employees face in litigation by providing them with a statutory remedy when an employer breaches its contractual obligation to pay wages. The WPCL does not create an employee's substantive right to compensation; rather, it only establishes an employee's right to enforce payment of wages and compensation to which an employee is otherwise entitled by the terms of an agreement.

*Hartman*, 766 A.2d at 352. "[T]he Pennsylvania rules of statutory construction require the civil provisions of the WPCL to be liberally construed." *Id.* at 353 (citing 1 Pa.C.S.A. § 1928(c)).

The WPCL provides a right of action to "any employe" to whom "any type of wages is payable." 43 P.S. § 260.9a(a). There are two distinct categories of "wages" under the WPCL, "earnings" and "fringe benefits or wage supplements." 43 P.S. § 260.2a.

The WPCL's definition section, 43 P.S. § 260.2a, defines "wages" and "fringe benefits or wage supplements" as follows:

> **Wages.** Includes all earnings of an employe, regardless of whether determined on time, task, piece, commission or other method of calculation. The term 'wages' also includes **fringe benefits** or wage supplements whether payable by the employer from his funds or from amounts withheld from the employes' pay by the employer.
>
> **Fringe benefits or wage supplements.** Includes all monetary employer payments to provide benefits under any employe benefit plan, as defined in section 3(3) of the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.*; as well as separation, vacation, holiday, or guaranteed pay; reimbursement for expenses; union dues withheld from the employes' pay by the employer; **and any other amount to be paid pursuant to an agreement to the employe**, a third party or fund for the benefit of employes.

43 P.S. § 260.2a (emphasis added). Under these definitions, "any other amount to be paid pursuant to an agreement with an employe" constitutes fringe benefits, which in turn constitute wages under the WPCL. *See also Shaer v. Orthopaedic Surgeons of Cent. Pennsylvania, Ltd.,* 938 A.2d

457, 465 (Pa. Super. 2007) ("severance pay and other separation related contractual arrangements are indeed covered by the WPCL").

With this statutory framework in place, we turn to the allegations in Count V of the complaint. Construed in the light most favorable to Appellant, the complaint states a valid cause of action under the WPCL for two reasons. First, the stock options in the parties' original agreement are considered "fringe benefits" under the WPCL. 43 P.S. § 260.2a; *Scully v. US WATS, Inc.*, 238 F.3d 497 (3d Cir. 2001).[7] In *Scully*, the plaintiff entered into a two-year agreement to serve as the defendant's president and CEO. As an inducement for the plaintiff to remain the full two years, the defendant granted him an option to purchase 850,000 shares of restricted stock that would vest over a two-year period. Before the two-year period expired, the defendant terminated the plaintiff without just cause. Subsequent to termination, the plaintiff attempted to exercise his option to purchase 600,000 shares that had vested by that date, but the defendant refused to honor the option. The plaintiff contended that the defendant violated the WPCL by refusing to honor the option. The district court ruled in favor of the defendant, but the Third Circuit reversed.

---

[7] Although not binding on us, we may cite federal authority for its persuasive value. *Bochetto v. Piper Aircraft Co.*, 94 A.3d 1044, 1050 (Pa. Super. 2014).

The Third Circuit held that the stock option extended to the plaintiff "falls within the [WPCL's] definition of fringe benefits or wage supplements because it represents an 'amount to be paid pursuant to an agreement to the employee.'" **Id.**, 238 F.3d at 517. The court continued:

> [A] stock option may qualify as earned compensation under the WPCL if the employer specifically agreed to deliver the option as employment compensation . . . [This case] presents exactly this situation. Stock options provide an incentive to an employee to work to increase the stock's value and thereby benefit the company . . . The company benefits because the stock option lowers the amount of up-front compensation costs that must be paid directly to the employee, but the employee bears a considerable risk since his compensation will not increase unless the stock value increases. Thus, stock options are often termed "contingent compensation." . . .
>
> [The parties] entered into this precise arrangement. As the District Court noted, "[t]he entire thrust of the overall arrangement between plaintiff and the defendants was that plaintiff's efforts in improving the fortunes of the company would be rewarded on the basis of the company's improved condition as of a year after the exercise of the option." **Scully v. US WATS, Inc.**, No. CIV. A. 97–4051, 1999 WL 592695, at *1 (E.D.Pa. June 10, 1999).
>
>> [I]t is quite apparent that plaintiff's whole purpose in entering into these arrangements was the expectation that, as a result of his efforts, the company would experience a big improvement in its fortunes, and plaintiff would share in that prosperity. Defendants wrongfully deprived plaintiff of that opportunity[] and should not be permitted to insist that plaintiff's chance for future profit ended as of January 23, 1997 [the date he exercised his option]. . . .
>
> **Scully**, 1999 WL 553474, at *5.
>
> Under these circumstances, we think it clear that, once [the plaintiff] entered into the two-year oral employment contract, he needed to do no more to bind [the defendant] to the stock option.

- 30 -

[The plaintiff's] stock option was thus "earned within the meaning of the WPCL because [he] was not required to render any further services before they vested and became exercisable."

*Id.* at 517-18. We find this analysis persuasive and similarly conclude that the *stock options* provided to Appellant in the original April 2019 agreement constitute fringe benefits covered under the WPCL.

Second, accepting as true the averment that the parties entered a settlement agreement on February 3, 2020, the stock shares promised under this agreement constitute fringe benefits, and therefore wages, under the WPCL. Under **Scully**, Appellant's right to stock options, as a component of the parties' original agreement, is a fringe benefit that vested during Appellant's employment. The 150,000 stock shares promised in the February 3, 2020 settlement represent the parties' compromise of the number of stock options Appellant earned, and thus was entitled to exercise, during his employment. Consequently, the stock shares are fringe benefits because they relate back to stock options that were fringe benefits, and hence wages, under Appellant's employment agreement. Since the stock shares qualify as wages, Appellant states a valid claim under the WPCL due to Appellee's failure to issue them.

We do not agree with the grounds advanced by the trial court or Appellee for rejecting Appellant's WPCL action. The trial court rejected Appellant's WPCL claim, stating, "[Appellant] relies on the February 3, 2020 email to make a claim that he is owed employee compensation in the form of

150,000 shares which [Appellant] would characterize as wages. As the parties have not settled, there is no binding contract that could be remotely construed to require 'wage' compensation." Trial Ct. Op. at 6. The trial court's rationale is incorrect because, as held above, the allegations in the complaint, accepted as true, demonstrate that the February 3, 2020 agreement was binding on Appellee, and the promised shares relate back to options that were a part of Appellant's employment agreement.

Citing three federal decisions, **Riseman v. Advanta Corp.**, 39 F. App'x 761 (3d Cir. 2002), **De Ascencio v. Tyson Foods, Inc.**, 342 F.3d 301 (3d Cir. 2003), and **Meister v. Sun Chem. Corp.**, 2018 WL 4961596 (E.D. Pa. Oct. 15, 2018), Appellee argues that the stock shares fall outside the protections of the WPCL. **Riseman** held the mere fact that certain compensation is not payable until a future date is not necessarily fatal to a WPCL claim so long as the employee is deemed to have earned it during his employment. **Id.** at 765. **De Ascencio** stated in dicta that the WPCL does not create a right to compensation, but rather only provides a statutory remedy when the employer breaches a contractual obligation to pay earned wages. **Id.** at 304. It is the contract between the parties that governs in determining whether specific wages are earned. **Id. Meister**, on the other hand, held that an agreement to make post-employment payments based upon post-employment considerations could not be considered wages or compensation earned because the plaintiff did not earn them during his

employment. Appellee cites to these cases in support of its belief that the agreement to issue stock shares under the February 3, 2020 agreement places them outside what was earned during employment. As we have discussed, however, since the February 3, 2020 agreement provides for the issuance of stock in consideration of options earned during employment, the shares may be considered fringe benefits, and hence wages, under the WPCL.

Accordingly, we conclude that Count V of the complaint states a valid cause of action for recovery under the WPCL. The trial court erred in dismissing this count of the complaint.

For the reasons articulated above, we affirm the trial court's dismissal of Counts II, III and IV of the complaint, and we reverse the dismissal of Counts I and V.

Order affirmed in part and reversed in part. Order affirmed to the extent it dismissed Counts II, III and IV of complaint. Order reversed to the extent it dismissed Counts I and V of complaint. Counts I and V are reinstated, and this case is remanded for further proceedings on those counts. Jurisdiction relinquished.

Judge Musmanno did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>11/09/2022</u>