515 A.2d 571

**Carl A. VENO and Carl T. Davies, Appellants,**

**v.**

**Charles P. MEREDITH, III, Ella C. Meredith, and The Free Press, Appellees.**

Superior Court of Pennsylvania.

Argued June 17, 1986.

Filed Sept. 22, 1986.

John M. Yarema, Emmaus, for appellants.

Michael S. Goodwin, Doylestown, for appellees.

Before CIRILLO, President Judge, and CAVANAUGH and TAMILIA, JJ.

CAVANAUGH, Judge:

On December 28, 1979, Carl A. Veno and Carl T. Davies, appellants, were discharged from their employment with a Quakertown, Pennsylvania newspaper, *The Free Press*. Davies had been a reporter with the newspaper and Veno its managing editor. On December 28, 1979, an article authored by Davies appeared on the front page of the paper which portrayed a Bucks County judge in an unfavorable light.

The article was titled, "Bucks Judge's Business Dealings Questioned." It stated that the Judge "may be vulnerable to violations of conflict of interest prohibitions in the state Code of Judicial Conduct as a result of his business dealings" with a certain "millionaire sportsman and developer."

The article further stated that the Judge is President of a residential development corporation and that his business associate in this project, (the aforementioned "millionaire sportsman and developer"), often "wind[s] up in court" as either a plaintiff or defendant in civil suits. And, that the business associate recently had been involved in a case "initially scheduled to be heard before" the Judge. This, according to the article, "nearly placed the judge in apparent conflict with the state Code of Judicial Conduct." The article continued:

> Canon 5 of the code requires that 'a judge should relegate his extra-judicial activities to minimize the risk of conflict with his judicial duties.'

> According to the canon, 'a judge should refrain from financial and business dealings that tend to reflect adversely on his impartiality, interfere with the proper performance of his judicial duties, exploit his judicial position, or involve him in frequent transactions with lawyers or persons likely to come before the court on which he serves.'

The article states that the judge was spared from having to decide whether to disqualify himself because of a "legal maneuver." And, "[i]f his business relationship with [the developer] continues, [the judge] would appear to be more apt to violate a provision of Canon 5 of the Code of Judicial Conduct prohibiting a judge from financial dealings that would involve him in ' ... frequent transactions with lawyers or persons likely to come before the court on which he serves.' "

Reacting to the article, the newspaper's owner, Charles M. Meredith, III told the editor, Veno, that the articles were unfair to the judge and ordered him to dismiss the author, Davies. When Veno refused, Mr. Meredith himself discharged not only Davies but also Veno.

On December 31, 1979, the *Free Press* published an editorial by Meredith which apologized to the judge. Under the heading "Our Opinion", this editorial states:

I regret the tone of the articles which appeared in Friday's edition of The Free Press concerning [The Bucks County Judge]. The articles implied that [The Judge] would have a possible conflict of interest if he presided over a case involving his own business associate.

The fact is that [The Judge] did not preside in an appeal involving his business associate. I believe that [The Judge] is an honest man. It is impossible that he would ever put himself in the position of a conflict of interest.

The Friday articles were not thoroughly researched and contained unsupported and indirect charges of conflict of interest. As a result, the writer and editor of this newspaper no longer are affiliated with the Free Press.

My concern in publishing The Free Press transcends producing the best local news coverage. Above that, lie the most important journalistic rules: Fairness and accuracy.

We were unfair in our reporting of the ... stories [about the Judge] and I apologize publicly to the Judge and to our readers.

The challenge for us remains unchanged. Get the story straight, and be fair. If there is something wrong in our communities, this newspaper will continue to tell the people what the problems are. But the proper research must be made, and both sides of an issue must be fairly presented.

Our job is to publish reports which are accurate and fair. The Free Press' new Editor Gary Andrews and I are committed to this precept.

Charles Meredith
Publisher

On January 2, 1980, the new editor of The *Free Press* wrote the following published editorial:

## OUR OPINION

### New editor of Free Press

Two things a newspaper must always strive to maintain are its high standards of truth and a keen eye for

fairness. As the new editor of the Free Press, I can assure the public that those two standards will be our primary concerns.

If there is one aspect of its existence that a newspaper must maintain to do its job effectively, it is the public's trust. Without the public's belief that the newspaper is presenting a fair and unbiased look at the truth, the entire concept of a "free Press" dwindles. No longer could we be called a "watchdog for the public" if we ourselves did not adhere to the highest standards of ethical conduct.

There will be no vendettas, no witchhunts where none are indicated. The Free Press will be known as possessing the highest standards of fairness. It is important that the public be aware of this. When you see a story in this newspaper, you will know that it has met the tests of fairness and accuracy.

Lest the servants of government feel The Free Press will not keep a sharp eye on their doings, let them be forewarned. Wherever the public's money or trust is involved, this newspaper will be diligent. Elected officials who betray the public trust should be routed out, and we will be continually on the alert for such individuals.

. . . .

Veno and Davies filed a complaint against Charles M. Meredith, III, Ella C. Meredith, and the *Free Press* alleging that:

1) they were libeled by the aforementioned editorials published after their discharge; and,

2) their employment contracts were illegally terminated.

Appellees filed preliminary objections in the form of a demurrer. The Honorable Donald F. Wieand, specially presiding, entered an order sustaining the appellees' preliminary objections to the appellants' causes of action alleging defamation. Post-trial motions, filed to overturn the dismissal, were denied.

Thereafter, the case went to trial on the issues concerning the termination of employment. At the conclusion of appellants' case-in-chief, the court granted a nonsuit in favor of appellees and against Veno. The case for Davies went to the jury and a verdict was returned in his favor. Veno filed post-trial motions to remove the nonsuit. These motions were denied, and this appeal followed. Davies' discharge is not at issue in this appeal.

## I.

Appellants first allege that they presented sufficient facts from which a jury could conclude that the editorials are capable of a defamatory meaning. We disagree.

"Preliminary objections in the nature of a demurrer admit as true all well pleaded, factual averments and all inferences fairly deducible therefrom. . . . Conclusions of law, however, are not admitted by a demurrer." *Cunningham v. Prudential Property & Cas. Ins.*, 340 Pa.Super. 130, 133, 489 A.2d 875, 877 (1985).

Appellants argue that the editorials constitute libel because they attacked their professional integrity and competence. We disagree.

■ "Initially ... it is the court's function and not the jury's to determine whether a given communication is capable of defamatory construction." *Vitteck v. Washington Broadcasting Co.*, 256 Pa.Super. 427, 431–32, 389 A.2d 1197, 1199 (1978). "If the court determines that the statement is capable of defamatory meaning, it is for the jury to determine whether it was so understood by the recipient." *Corabi v. Curtis Pub. Co.*, 441 Pa. 432, 441, 273 A.2d 899, 904 (1971). Conversely, if a court determines that a statement is not capable of a defamatory meaning, then it is proper for the court to sustain a demurrer.

The trial court concluded that the two newspaper editorials in question were opinions. "Whether a particular statement constitutes fact or opinion is a question of law."

*Braig v. Field Communications,* 310 Pa.Super. 569, 579, 456 A.2d 1366, 1372 (1983).

In ascertaining whether a communication is capable of defamatory meaning, a special standard is applied when the communication is an opinion. A statement in the form of an opinion is actionable only if it "may reasonably be understood to imply the existence of *undisclosed* defamatory facts justifying the opinion." *Beckman v. Dunn,* 276 Pa.Super. 527, 535, 419 A.2d 583, 587 (1980) (emphasis supplied), citing Restatement (Second) Torts § 566 (1977). "A simple expression of opinion based on disclosed . . . facts is not itself sufficient for an action of defamation . . ." *Braig, supra,* 310 Pa.Super. at 581, 456 A.2d at 1373, citing Restatement (Second) Torts § 566 Comment c (1977).

█ The lower court properly sustained appellees' demurrer. The editorial by Charles Meredith, publisher of The Free Press, was not capable of defamatory meaning. It merely stated an opinion that the tone of the article, which suggested impropriety on the Judge's part, was not supported by the facts asserted in the article. The Davies article is a disclosed fact as it was published for public consumption in the same newspaper, just days before the editorial. Nowhere in his editorial did Mr. Meredith imply that he was privy to some additional facts, beyond the Davies article, which supported his opinion. The editorial specifically states that the Judge did *not* have a conflict of interest, and that it was improbable that an honest man such as the Judge would ever preside over a case involving his own business associate. It states that the tone of the Davies article suggested an impropriety that was unsubstantiated by the facts adduced therein. The statements in the editorial that the Davies article was "not thoroughly researched," that the article "contained unsupported and indirect charges of a conflict of interest," and that the newspaper was "unfair in [its] reporting," are nothing more than opinions based on disclosed facts. The disclosed facts were that the Judge did not have a conflict of interest with his business associate because he had never presided over a

case involving his business associate—a fact stated in the editorial itself; and, that the tone of the article implied that the Judge's behavior smacked of impropriety—a fact discernible from reviewing the Davies article. In short, we are not aware of any undisclosed facts upon which the opinion was based; nor does the editorial *imply* the existence of such facts.

■ The January 2nd editorial by Gary Andrews, the new editor of the Free Press, also was incapable of defamatory meaning. It was nothing more than a statement of his goals and aspirations as new editor. One must strain to find even an implied reference to appellants. Appellants urge this court to read the editorial in conjunction with Mr. Meredith's editorial to glean defamatory meaning. Specifically, appellants argue that a reader of Mr. Andrews' editorial on January 2, who also had read Mr. Meredith's editorial of three days before, would naturally conclude that when Mr. Andrews wrote, "there will be no vendettas, no witchhunts where none are indicated," he was referring to the Davies article. In so doing, appellants maintain, Mr. Andrews was calling into question their integrity and competence.

It is not clear that Mr. Andrews was making a specific reference to the Davies article. However, even if we were to assume that Mr. Andrews was making such a reference, he still could not be held liable for defamation as the sentence would be based on disclosed facts, namely that the tone of the Davies article suggested an impropriety which was unsubstantiated in that article. Andrews' opinion cannot be considered defamatory, "no matter how unjustified and unreasonable this opinion may be or how derogatory it is." *Braig, supra*, 310 Pa.Superior Ct. at 581, 456 A.2d at 1373, citing Restatement (Second) Torts § 566 Comment c (1977). This contention is therefore without merit.

## II.

Turning to the next issue, once again we are asked to decide whether or not an employer had the right to discharge an employee.

In the area of employment relations, Pennsylvania still largely adheres to the "at-will" rule. A brief overview of the law in this area follows.

"Since at least 1891, Pennsylvania courts have recognized the rule that, absent a contract, employees may be discharged at any time, for any reason, for no reason at all.[1] . . . . In recent years, courts have become increasingly

1. The at-will rule had become so firmly entrenched by 1915 that our Supreme Court quoted with approval Professor Labbat's work on Master and Servant relations. " 'The preponderance of American authority in favor of the doctrine that an indefinite hiring is presumptively a hiring at will is so great that it is now scarcely open to criticism.' " *Hogle v. DeLong Hook & Eye Co.*, 248 Pa. 471, 94 A. 190 (1915) (quoting 1 C. Labatt, Master and Servant § 160 at 519 (1913)). The rule has since been reaffirmed so often that it defies citation. The rationale justifying the employment at-will rule has been described as follows:

"Professor Farnsworth, reporter to the Restatement (Second) of Contracts, has succinctly stated:
'Conscious of the traditionally intimate nature of the relationship between employer and employee, courts have regularly found that [there is no language in the contract relevant to termination of the employee] *despite absolute promises on both sides.* Then by implication, they have almost invariably supplied a term allowing either party to terminate at will.'
E.A. Farnsworth, *Contracts* 532 (1982) (emphasis added).

. . . .

"The at-will rule is a legal recognition of the "intimate nature" of the master-servant relationship of which Professor Farnsworth wrote, *supra.* In contrast to the employment setting, consider a *sales* relationship where a consumer purchases an appliance. It matters not at all whether the consumer and manufacturer get along personally. They usually never even meet. Whereas, it is often crucial to the employment relationship that the parties work well together and trust one another. Because so much depends on the subjective satisfaction of both parties in this area, the law is reluctant to require either to articulate *objective* "just cause" reasons when either decides to sever the relationship. The at-will rule is an articulation of this reluctance. Moreover, the employment relationship is often more complex than other types of contractual relationships. In the case of the sale of an appliance, both buyer and seller can readily articulate objective reasons they might have for dissatisfaction with the other. The seller will be justifiably dissatisfied if the buyer's check bounces. The buyer will be justifiably unhappy if the product fails to perform to his reasonable expectations. In the employment setting, it may be impossible for either party to state with objective clarity the reasons for his dissatisfaction with the other. (The dissatisfaction may be borne of an accumulation of seemingly trivial things.) However, the law, via the at-will rule,

willing to afford the discharged employee relief based on ever-widening theories grounded in contract and also on causes of action sounding in tort." *Darlington v. General Electric*, 350 Pa.Super. 183, 190–91, 504 A.2d 306, 309–10 (1986).

Taking a nationwide view of the law in this area, it is apparent that what once was the *corpus juris* of employment relations has lately become an amorphous mass of confusion replete with holdings that defy reconciliation from one jurisdiction to the next. The at-will presumption, the citadel that once governed the field with such predictability, has been eroded of late by piecemeal attacks on both the contract and tort fronts and the entire field seems precariously perched on the brink of change.

*Martin v. Capital Cities Media, Inc.*, 354 Pa.Super. 199, 208, 511 A.2d 830, 834 (1986).

"Pennsylvania has thus far escaped the widescale turbulence so common to the field and still clings to the at-will presumption." *Id.*

■ The essence of the employment at-will presumption is that the decision to discharge an employee is best left to the managerial prerogative and generally will not be reviewed in a judicial forum. The other side of the rule is that an employee may resign at any time, for any reason, or for no reason at all. Of course, a discharge may be subject to review in a judicial forum if the employer and employee so agree.

■ The most elementary way that the parties can overcome the at-will presumption is by express contract. For example, a contract may be made for a definite term, or it may forbid discharge in the absence of just cause or without first utilizing an internal dispute resolution mechanism. The presumption may also be overcome by implied contract. That is, all of the surrounding circumstances of the hiring

recognizes that this dissatisfaction is as deserving of judicial relief as that in any other contractual setting."
*Martin v. Capital Cities Media, Inc., supra,* 354 Pa.Superior Ct. at 213–214, 511 A.2d at 837.

may indicate that the parties did not intend the employment to be "at-will".

Another way that the at-will presumption may be overcome is where the employee gives the employer sufficient consideration in addition to the services for which he was hired. (See our discussion, *infra*.)

■ In short, if there is a dispute over the discharge of an employee, the threshold inquiry is whether or not the employment was at-will. If it was, then the discharge is not reviewable in a judicial forum. An exception is that the discharge will be reviewable in a judicial forum when there is sufficient evidence to suggest that it was against public policy or made with the specific intent to harm the employee. The latter two causes of action are classified as "wrongful discharge" torts in Pennsylvania. They are limited exceptions to the at-will presumption in this Commonwealth and only rarely occasion relief for the discharged employee. *Darlington v. General Electric, supra.*

This court has recently reaffirmed the at-will rule in the en banc case of *Banas v. Matthews International Corporation*, 348 Pa.Super. 464, 483–86, 502 A.2d 637, 647–48 (1985) (Judges Rowley, Beck and Johnson dissenting.) There, the employee was discharged after he used company property for personal use. The employee sued, alleging that the employee handbook issued by employer gave him permission to so use the company property in question. The employee alleged no public policy violation or specific intent to harm. The jury found for the employee, but on appeal, this court reversed. We wrote:

> Given the jury's verdict, we may take it as a fact that [the employer] did give permission. But that is irrelevant. Appellant's handbook nowhere provided that an employee would be dismissed *only if the facts warranted it. If* the handbook had contained, if not expressly at least by clear implication, a just cause provision, *then* appellee's claim might have merit.
>
> .... Since here the handbook did not contain, expressly or by clear implication, any just cause provision appellee

has shown nothing to take his case out of the settled employee-at-will rule. As an employee-at-will, he could be dismissed, as he *was* dismissed, because *appellant believed* that he had made the grave marker without permission and knowing that to make it was against long-settled company policy. Whether appellant's belief was *correct—i.e.*, in accordance with fact—has nothing to do with the case; that it has nothing to do with the case is of the essence of appellee's status as an employee-at-will, who may be dismissed 'for any or no reason.'

In *Banas*, we determined that because the appellee was an at-will employee, it was simply not for a judicial trier-of-fact to decide whether the dismissal was "just". The recent decisions in *Darlington, supra,* and *Capital Cities, supra,* involved similar contentions by appellant. In *Darlington,* the employee was discharged after he was accused of certain expense and phone account irregularities. Appellant's position was that he did not knowingly and deliberately engage in the impermissible conduct he was charged with *but was merely following company policy as he knew it.* Nevertheless, judgment n.o.v. was entered against the employee and this court affirmed. Similarly, in *Capital Cities,* the employee was a newspaper copy editor who was discharged after she placed an ad in a rival newspaper. The employee testified that she "knew" there was no policy forbidding her action. The lower court nonetheless granted employer's motion for summary judgment and this court affirmed.

A common principle runs throughout *Banas, Darlington,* and *Capital Cities.* In all three, the employee was discharged for doing something he believed he was allowed to do. However, the courts in all three held that because there was no contract limiting the employer's right to discharge at will, *the reason for the discharge was not subject to review in a judicial forum.* This non-reviewability (except for public policy violations and where there is specific intent to harm) is the *sine qua non* of the at-will relationship.

■ Moreover, because of its vitality, courts insist that to contract-away the at-will presumption, much clarity is required. The intention to overcome the presumption will not be unheedingly inferred. This court has recently held that the modification of an "at-will" relationship to one that can never be severed without "just cause" is such a substantial modification that a very clear statement of an intention to so modify is required. *Martin v. Capital Cities Media, Inc.*, 354 Pa.Super. 199, 511 A.2d 830 (1986). Absent this clarity, again, the relationship is "at-will" and a discharge is not reviewable in a judicial forum (absent sufficient evidence of "wrongful discharge".)

*Banas, supra, Darlington, supra,* and *Capital Cities, supra,* each noted the frequent criticisms levelled against the at-will rule. "The citadel of the at-will presumption has been eroded of late but it has not been toppled. Perhaps the time has come for employees to be given greater protection in this area" *Darlington v. General Electric,* 350 Pa.Super. 183, 190, 504 A.2d 306, 310 (1986). However, given our Supreme Court's adherence to the rule,[2] and the sweeping policy change that would accompany abrogation of it, the legislative process seems a more appropriate forum than the judiciary to decide the parameters of any major alterations in this area.[3]

**2.** *See Geary v. United Steel Corporation,* 456 Pa. 171, 319 A.2d 174 (1974), which reaffirmed the rule.

**3.** As one commentator has written:
> "That all employees are entitled to protections against wrongful termination should be taken as a given."

However, he continued, "[c]ourts are neither equipped to handle the additional caseload nor sufficiently experienced in the area of employee terminations.... [c]ourts have no capacity to construct an administrative mechanism for daily enforcement and the average person has no ready access to their more formalized processes." Moreover, "[c]ourts are likely to be long on generalization and short on detail when the situation requires outlining procedures and remedies." K.H. Decker, *At-Will Employment in Pennsylvania—A Proposal For Its Abolition And Statutory Regulation,* 87 Dickinson L.Rev. 477, 493–94 (1983). *See also, Darlington v. General Electric, supra. Martin v. Capital Cities Media, Inc.,* 354 Pa.Super. 199, 511 A.2d 830 (1986). Much of the controversy over erosion of the at-will presumption concerns the extent that recovery should be permitted based on

Turning to the instant case, appellant alleges that he presented sufficient evidence from which a jury could conclude that his employment was not terminable at-will and that therefore the court erred in granting a nonsuit. He alleges the following facts in support of this contention.

In April, 1973, when appellant and his wife purchased a home, his employer, Mr. Meredith co-signed both the disclosure statement and demand note in the sum of $5,400.00. Appellant further testified that Mr. Meredith said to him, "We're both the same age, we're both going to retire together, we're not making a lot now, but we'll make it later on. I want you to raise your children here. I want them to go to the school. I want to retire together." Moreover, appellant turned down other job opportunities throughout his employment, including one from his former employer—an offer he made known to Mr. Meredith.

theories of *public policy*. As the leading treatise on employee dismissal law states:

"These theories involve balancing judgments that arguably are better left to the legislature.... Moreover, employers face more uncertainty if an expansive version of implied-in-law covenant and tort liability for wrongful dismissal is accepted. The more recent public policy tort cases in Connecticut and New Hampshire suggest that virtually any imaginative employee can articulate a sufficient public policy to force an employer to trial over what, realistically, is a quarrel over practices legitimately within the employer's sole control. It is widely believed that the prospect of litigation over personnel actions retards supervisory and rank-and-file productivity. Expansive doctrines of liability on good faith on public policy grounds can retard productivity growth."

. . . .

"[I]f tort law permits employees to recover damages for dismissals resulting from disagreements with their employers over product design or accounting practices, the courts will be drawn very substantially into second-guessing basic business decisions made by employers. Courts are not well suited to make these decisions in a market economy."

H. Perritt, *Employee Dismissal Law and Practice* 23–24 (1984).

We would add that abrogation of the at-will rule could have the socially deleterious effect of forcing employers to become overly cautious about who they hire, perhaps fearing to hire marginally qualified persons who would be more likely candidates for discharge at some point. The employer would naturally not care to hire someone who might later subject him to a lawsuit.

■ These facts could not support a recovery for appellant. The statements made by the employer are broad, vague, and do not suggest that the parties contemplated a definite duration for the employment. Such statements generally do not overcome the at-will presumption. *Darlington v. General Electric, supra.*

Moreover, the statements have an aspirational quality to them. The law does not attach binding significance to comments which merely evince an employer's *hope* that the employee will remain in his employ until retirement. In the instant case, there was no express contract limiting the employer's ability to discharge; nor was there a reasonable "understanding" to that effect.

■ Nor do we find the appellant's refusal to take other jobs as significant to his contention. This forebearance was merely a manifestation of his preference to remain with the Free Press and in no way suggests he had the reasonable belief that he could never be fired except for "just cause."

■ Appellant also contends that he gave his employer sufficient consideration additional to the services for which he was hired and therefore his employment was not at-will. The alleged consideration consists of the following: that appellant gave up a job with a newspaper and moved his family from Newark to Pennsylvania, and that throughout the years he refused other employment opportunities.

We stated in *Darlington v. General Electric*, 350 Pa.Super. at 201, 504 A.2d at 315:

[A] court will find 'additional consideration' when an employee affords his employer a substantial benefit other than the services which the employee is hired to perform, or when the employee undergoes a substantial hardship other than the services which he is hired to perform. 'If the circumstances are such that a termination of the relation by one party will result in great hardship or loss to the other, as they must have known it would when they made the contract, this is a factor of great weight in

inducing a holding that the parties agreed upon a specific period.' 3 A. Corbin, *Corbin on Contracts* § 684 (1960). When sufficient additional consideration is present, an employee should not be subject to discharge without just cause for a reasonable time. *See Darlington v. General Electric,* 350 Pa.Super. at 199–200, 504 A.2d at 314. The length of time during which it would be unreasonable to terminate, without just cause, an employee who has given additional consideration should be commensurate with the hardship the employee has endured or the benefit he has bestowed.

■ Appellant has not presented evidence tending to show that he gave his employer sufficient additional consideration. The detriments alleged are commensurate with those incurred by all manner of salaried professionals. We do not believe that appellant's termination by the Free Press some eight years into his employment over a legitimate difference of opinion constitutes the kind of "great hardship or loss" that Professor Corbin referred to, *supra.* Virtually all terminations result in some hardship and loss to the employee. Instantly, we are not presented with facts to suggest that appellant brought to the employment so substantial a benefit, or incurred so detrimental a hardship in taking the job, that he should be accorded treatment any different from the typical at-will employee.[4]

4. Appellant cites *Lubrecht v. Laurel Stripping Co.,* 387 Pa. 393, 127 A.2d 687 (1956) in support of his contention. In that case, employee was hired in 1942 as general manager of all mining and stripping operations of the defendant company in respect of all contracts which the company then had or should thereafter acquire. In reliance on this, employee surrendered other job opportunities and abandoned his development of a coal property for his own account. When he was discharged 6 years into his employment, he sued. The lower court granted recovery and the supreme court affirmed.
*Lubrecht* is distinguishable from the instant case. There, unlike the instant case, the contract itself afforded an inference that the employment was not to be terminable at-will. This, along with the additional consideration, was enough to overcome the at-will presumption.
Appellant also cites *Lucacher v. Kerson,* 158 Pa.Super. 437, 45 A.2d 245 (1946), where an employee was promised "permanent" employment in his new job. In order to take the job, he moved from New York to Philadelphia. Three days into his employment, employee was abruptly discharged. The court allowed recovery and held the con-

■ Appellant's final contention is that the discharge violates "public policy". He alleges that his discharge has somehow limited his right to free speech. We find this contention to be meritless.

"[T]he action for wrongful discharge is a narrow exception to the at-will rule...." *Martin v. Capital Cities Media, Inc.*, 354 Pa.Super. at 222, 511 A.2d at 842. If a discharge constitutes an infringement of an important right or public duty, then a court must ask whether there is a separate and legitimate business reason to justify it.

The discharge in this case does not involve an infringement of a recognized public policy, and thus, we need not even inquire as to whether the employer had a legitimate business reason for it. Because appellant had no constitutional "right" to exercise free speech in the employer's newspaper, we need delve no further into this allegation.[5]

Order affirmed.

___

tract of "permanent" employment was capable of enforcement due largely to the additional consideration rendered by employee. It is doubtful that the court in *Lucacher* should have enforced the terms of the vague and broad contract which allowed for "permanent" employment. Rather, the court should have ignored the "promise" of permanent employment because of its breadth and vagueness and *inferred* a contract for a reasonable length of time based solely on the sufficient additional consideration. The facts in *Lucacher* are obviously different from those presented instantly. In *Lucacher*, after having moved from New York to Philadelphia in reliance on a promise of a new job, employee was discharged just three days into his employment. Here, in contrast, appellant had been employed for 8 years before he was dismissed. The "reasonable length of time" here has surely passed based on the consideration given.

5. Some speech is not protected by the constitution, and so no legitimate business reason is needed to justify a discharge occasioned by such speech.

"Just as one does not have the right to shout fire in a crowded theater, so too, the theater owner surely has the right to discharge an usher if he is the one who shouted 'fire'."

*Martin v. Capital Cities Media, Inc.*, 354 Pa.Super. at 225, 511 A.2d at 843.

Even if a discharge implicates some important public policy, the discharge may not be wrongful if there is a legitimate business reason to support it. In *Reuther v. Fowler and Williams, Inc.*, 255 Pa.Super. 28, 386 A.2d 119 (1978), we held that an employee could not be discharged for serving jury duty *unless* the employer has a separate,

plausible, and legitimate business reason for the discharge. Some public policies are of greater importance than others. It follows that the more important the public policy implicated by the discharge, the harder will it be to assert a sufficient separate and legitimate business reason to justify the discharge.