J-A08021-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| MATTHEW GIORDANO | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| ASHFIELD HEALTHCARE, LLC A/K/A | : | No. 1655 EDA 2024 |
| ASHFIELD ENGAGE | : | |

Appeal from the Order Entered May 21, 2024
In the Court of Common Pleas of Bucks County Civil Division at No(s):
2022-06839

BEFORE:  LAZARUS, P.J., McLAUGHLIN, J., and SULLIVAN, J.

MEMORANDUM BY McLAUGHLIN, J.:　　　　　　　　**FILED JULY 16, 2025**

Michael Giordano appeals from the order sustaining Ashfield Healthcare, LLC, a/k/a Ashfield Engage's ("Ashfield") preliminary objections and dismissing his amended complaint. We affirm.

The following facts are gleaned from Giordano's amended complaint, which we must accept as true.[1]

Ashfield is a principal subsidiary of UDG Healthcare and specializes in providing services for the pharmaceutical and healthcare industry. Am. Compl. at ¶¶ 3, 7. Giordano was employed by Ashfield as an Information Technology

---

[1] "When reviewing the dismissal of a complaint based upon preliminary objections in the nature of a demurrer, we treat as true all well-pleaded material, factual averments and all inferences fairly deducible therefrom." ***Burgoyne v. Pinecrest Cmty. Ass'n***, 924 A.2d 675, 679 (Pa.Super. 2007) (citation omitted).

("IT") Manager of Support from February 4, 2019, to February 1, 2021. *Id.* at ¶ 36. Giordano's duties included ensuring Ashfield's IT was compliant with regulatory and security requirements and met financial controls. *Id.* at ¶ 38.

In 2020, "as Ashfield's pharma clients received federal agency approvals for their COVID-19 vaccines, Ashfield entered into multi-million dollar contracts to provide back-end services and deliverables to meet regulatory compliance and successful rollout, yielding extraordinary revenue and profits to Ashfield over an extremely short period of time." *Id.* at ¶ 41. By late 2020, "Moderna had partnered with Ashfield to support commercialization efforts of their groundbreaking COVID-19 vaccine, and secured with Moderna another new high margin/high profit COVID-based contract." *Id.* at ¶ 42. Giordano, along with two immediate supervisors, were "placed in charge of IT equipment under the Moderna contract, and w[ere] responsible for IT workflow and manpower, equipment purchases, [and] installation." *Id.* at ¶ 45.

In early 2020, Ashfield's IT department was audited by outside accountants who identified a substantial risk: "the IT staff was understaffed with significant manpower deficiencies, and IT struggled with delivering adequate IT client support on a daily basis." *Id.* at ¶ 47. Giordano alleges that his supervisor hid the audit findings and failed to share compliance infractions with him and the IT team, and thus the IT department was negatively impacted. *Id.* at ¶ 48. Giordano repeatedly complained to management about IT's lack of manpower and compliance violations to no avail. *Id.* at ¶¶ 48, 51, 56.

In March 2020, Ashfield closed its Fort Washinton office and required its employees to work from home remotely due to the COVID-19 pandemic. *Id.* at ¶ 64. Giordano alleges the following:

> 68. Beginning in February, 2020, and continuing over a period of 12 months, Giordano was told to transform his Bucks County home into a "makeshift IT UPS hub" to store Ashfield's laptops, wireless keyboards, iPads and related equipment.
>
> 69. Giordano lost total use of his garage, dining room, one bedroom, most of his basement, and fixtures and furniture inside his house, comprising a total of 1500 square feet of livable space.
>
> 70. Executives told Giordano he was personally responsible to store and ship IT equipment to new hires and contractors to support Ashfield's multi-million pharma-based contracts.
>
> 71. [Ashfield] told Giordano that unless he used his home as instructed, Ashfield would not be able to send/receive packages, IT operations would collapse and with it, IT jobs and Giordano's job.
>
> 72. On a daily basis, Giordano raised his concerns to [Ashfield] that his home and private life were severely impacted along with the safety of his family.
>
> . . .
>
> 75. Giordano was told if he did not cooperate, Ashfield's clients would break their multi-million dollar contracts with Ashfield and take their business elsewhere, which Giordano viewed as a clear threat to his own security over the interests of Ashfield and its stakeholders.
>
> . . .
>
> 79. Giordano was given an Ashfield AMEX card and access to Ashfield's purchase order systems to source equipment, however, most vendors would not accept the credit cards or purchase orders as a means of payment, and Ashfield had past negative credit history with key vendors.

80. Ashfield, as a bizarre unprecedented act, required Giordano advance over $30,000 from his personal credit card accounts (AmEx, MasterCard, Visa) to source and purchase iPads, cases and equipment to assure the success of the [pharma] contracts.

. . .

82. As ordered by high level management, Giordano worked under threat that if he did not have the finances available on his personal credit card to finance Ashfield's business, the [pharma] contracts would fail or key target dates missed, and Giordano would be terminated.

83. [Ashfield] refused to address Giordano's repeated complaints his personal credit and financial security were harmed and at risk, instead telling Giordano (and others in IT) he was "expendable" if he did not cooperate in this bizarre scheme to support Ashfield's contracts.

84. The unlawful AmEx arrangement went on from June, 2020 through September, 2020, when Giordano put a stop to it after he realized Ashfield might never reimburse him despite his demands.

85. Ashfield refused to fully pay off Giordano's credit card (MasterCard and Visa) debt until shortly before he was terminated, instead holding Giordano's job hostage to Ashfield's promise to pay the debt under threat of termination.

86. To date, Ashfield has never paid the interest charges or late fees on the debt, damaging Giordano's credit long term and subjecting him to threats of legal action by AmEx.

*Id.* at ¶¶ 68-72, 75, 79-80, 82-86.

At the end of 2020, Giordano returned the equipment stored at his house to Ashfield's Fort Washington office. *Id.* at ¶ 88. Management warned Giordano that any attempt by him to inform Ashfield's CEO about the IT and compliance violations would result in his termination. *Id.* at ¶ 103. In his last meeting with his supervisor in November 2020, Giordano stated that Ashfield

and IT were "failing to deliver on our commitments" and "the right hand never knows what the left hand is doing." *Id.* at ¶ 104. His supervisor assured Giordano that his IT concerns would be addressed by senior management. *Id.* at ¶ 106. On February 1, 2021, Ashfield terminated Giordano. *Id.* at ¶ 107.

On December 30, 2022, Giordano filed a complaint alleging wrongful termination. Ashfield filed preliminary objections to Giordano's complaint. On June 22, 2023, Giordano filed an amended complaint. The amended complaint contained the following counts:

- Count I – wrongful discharge – public policy violation (involuntary servitude – taking of property);

- Count II – breach of implied contract – wrongful discharge;

- Count III – wrongful discharge – public policy violation (involuntary servitude – debt coercion);

- Count IV – breach of implied contract – wrongful discharge;

- Count V – wrongful discharge – public policy violation (unlawful restraint — involuntary servitude (debt coercion));

- Count VI – wrongful discharge – public policy violation (unlawful restraint – involuntary servitude (taking of property));

- Count VII – breach of good faith and fair dealing;

- Count VIII – invasion of privacy (intrusion upon seclusion);

- Count IX – private nuisance;

- Count X – conversion – civil theft; and

- Count XI – unjust enrichment.

Ashfield demurred to Giordano's amended complaint. On May 21, 2024, the trial court sustained Ashfield's preliminary objections and dismissed the amended complaint with prejudice. This timely appeal followed.

Giordano raises the following issues:

1. Did the lower court err and/or abuse its discretion when it sustained Ashfield's preliminary objections to Count I [involuntary servitude  taking of property]; Count III [involuntary servitude — debt coercion]; Count V [unlawful restraint — involuntary servitude (debt coercion)]; and Count VI [unlawful restraint — involuntary servitude (taking of property)] of the amended complaint and dismissed Counts I, III, V and VI with prejudice?

2. Did the lower court err and/or abuse its discretion when it sustained Ashfield's preliminary objections to Counts II and IV [breach of implied contract — wrongful discharge] of the amended complaint and dismissed Counts II and IV with prejudice?

3. Did the lower court err and/or abuse its discretion when it sustained Ashfield's preliminary objections to Count VII [breach of good faith and fair dealing] and Count XI [unjust enrichment] of the amended complaint and dismissed Counts VII and XI with prejudice?

4. Did the lower court err and/or abuse its discretion when it sustained Ashfield's preliminary objections to Count VIII [invasion of privacy]; Count IX [private nuisance]; and Count X [civil theft — conversion] of the amended complaint and dismissed Counts VIII, IX and X with prejudice?

Giordano's Br. at 3-4.

Giordano first argues that the trial court erred when it sustained Ashfield's demurrer to Counts I, III, V, and VI. He asserts that he sufficiently pled a claim for wrongful discharge under Pennsylvania common law in those

counts. Giordano acknowledges that an at-will employee may be terminated at any time and for any reason. *Id.* at 16. However, he points out that an at-will-employee has a cause of action for wrongful discharge against the employer "when the discharge of an employee-at-will threatens public policy[.]" *Id.* at 17 (citation omitted).

Giordano argues that he sufficiently alleged that Ashfield violated public policy when it committed criminal conduct under 18 Pa.C.S.A. § 3012 in coercing Giordano into labor servitude. *Id.* at 24. He maintains that "Ashfield intentionally engaged in taking and retaining [his] real and personal property and cash and personal credit lines as a means to coerce his labor servitude to support his family, all to benefit Ashfield's business interests." *Id.* at 24-25. In Giordano's view, "Ashfield coerced [his] employment and held his job hostage to the threat Ashfield would not reimburse his significant debts, thereby coercing Giordano's employment by creating an external threat of financial and legal harm by AmEx over the debts," which was criminal conduct under Section 3012. *Id.* at 25.

Our standard of review from an order sustaining a preliminary objection in the nature of a demurrer is as follows:

> [O]ur standard of review of an order of the trial court overruling or granting preliminary objections is to determine whether the trial court committed an error of law. When considering the appropriateness of a ruling on preliminary objections, the appellate court must apply the same standard as the trial court.
>
> Preliminary objections in the nature of a demurrer test the legal sufficiency of the complaint. When considering

preliminary objections, all material facts set forth in the challenged pleadings are admitted as true, as well as all inferences reasonably deducible therefrom. Preliminary objections which seek the dismissal of a cause of action should be sustained only in cases in which it is clear and free from doubt that the pleader will be unable to prove facts legally sufficient to establish the right to relief. If any doubt exists as to whether a demurrer should be sustained, it should be resolved in favor of overruling the preliminary objections.

*Estate of Denmark ex rel. Hurst v. Williams*, 117 A.3d 300, 305 (Pa.Super. 2015) (citation omitted). Our scope of review is limited to the averments in the complaint together with the attached documents and exhibits in order to evaluate the sufficiency of the facts averred. *See Hill v. Ofalt*, 85 A.3d 540, 547 (Pa.Super. 2014). "The impetus of our inquiry is to determine the legal sufficiency of the complaint and whether the pleading would permit recovery if ultimately proven." *Burgoyne*, 924 A.2d at 679-80 (citation omitted).

In Pennsylvania, there is a "strong presumption" that all non-contractual employment relationships are at-will. *Salsberg v. Mann*, 310 A.3d 104, 126 (Pa. 2024) (citation omitted). Generally, there is no common law cause of action against an employer for wrongful termination of an at-will employee. *McLaughlin v. Gastrointestinal Specialists, Inc.*, 750 A.2d 283, 287 (Pa. 2000). "[T]he parties to the at-will employment relationship may terminate the relationship at any time, for any reason or no reason, except in the most limited of circumstances." *Salsberg*, 310 A.3d at 126 (citation and internal quotation marks omitted). "These circumstances include instances in which

the discharge of an at-will employee would violate a constitutional, contractual, or statutory provision, or would otherwise contravene a clear mandate of public policy." *Id.* (citation and internal quotation marks omitted).

The public policy exceptions to the at-will employment doctrine are "narrow" and fall into three categories: "an employer (1) cannot require an employee to commit a crime, (2) cannot prevent an employee from complying with a statutorily imposed duty, and (3) cannot discharge an employee when specifically prohibited from doing so by statute." *Hennessy v. Santiago*, 708 A.2d 1269, 1273 (Pa.Super. 1998) (abrogated on other grounds). Further, "the stated mandate of public policy, as articulated in the constitution, statute, or judicial decision, must be applicable directly to the employee and the employee's actions." *Hunger v. Grand Cent. Sanitation*, 670 A.2d 173, 175 (Pa.Super. 1996). "It is not sufficient that the employer's actions toward the employee are unfair." *Id.* at 175-76; *see also Reese v. Tom Hesser Chevrolet-BMW*, 604 A.2d 1072, 1074-75 (Pa.Super. 1992) (finding no public policy violation where employer required employee, as condition of continued employment, to reimburse it for portion of company loss; employer's action may have been unfair to employee, but it did not rise to the level of a public policy violation).

Here, Giordano was an at-will employee. As such, he could be terminated at any time for any reason unless his discharge violated public policy. Giordano claims that he sufficiently pled the following public policy exception to the at-will employment doctrine: that an employer cannot require

an employee to commit a crime. He alleges that Ashfield violated public policy when it committed criminal conduct when it coerced Giordano's labor servitude.

This claim does not fall under the public policy exception. Giordano does not allege that Ashfield compelled him to engage in criminal conduct or discharged him because he refused to commit a crime. Rather, he alleges that Ashfield committed various crimes, and he was subsequently terminated. That reason does not fall within the public policy exception. He also does not allege his termination resulted from statutorily protected activities or that a specific statute prohibited his termination. *Hennessy*, 708 A.2d at 1273. Thus, he failed to meet the public policy exception to the at-will employment doctrine and did not plead a cause of action for wrongful discharge. Accordingly, the trial court did not err in dismissing Counts I, III, V, and VI of the amended complaint.

Giordano next argues that the trial court erred in dismissing Counts II and IV (breach of implied contract – wrongful discharge). He asserts that in Counts II and IV, he alleged that an implied contract of employment existed, which required Ashfield to give cause for his termination, and Ashfield breached the implied contract when it terminated him without justification. He argues that an implied contract was created when he gave Ashfield additional consideration other than the services for which he was hired. Giordano asserts that the following allegations constituted additional consideration by Giordano such that his at-will employment with Ashfield was transformed into an implied

contract: "Ashfield's taking and retaining Giordano's residential property, and personal property and fixtures in Giordano's home to the harm and detriment of Giordano"; "Ashfield's taking and retaining Giordano's real and personal property as a means of coercion *i.e.*, as long as Ashfield retained, used, and occupied Giordano's home and his property and fixtures in his home, Giordano would have his IT job"; and "Ashfield's demands that he borrow $30,000 on his personal MasterCard and Visa credit cards in order to keep his job." Giordano's Br. at 31-32. In Giordano's view, the trial court "ignored material facts that Giordano suffered loss of use of his personal home, credit denigration, loss of cash and credit lines, loss of personal and financial security, and financial losses in his residential property, furniture and fixtures." ***Id.*** at 40.

An employee can rebut the presumption of at-will employment "by establishing that he gave his employer additional consideration other than the services for which he was hired." ***Donahue v. Fed. Exp. Corp.***, 753 A.2d 238, 245 (Pa.Super. 2000). Additional consideration is "when an employee affords his employer a substantial benefit other than the services which the employee is hired to perform, or when the employee undergoes a substantial hardship other than the services which he is hired to perform." ***Id.*** (citation omitted). This kind of consideration is narrowly defined. "The term 'consideration' is not used here as it is in the usual contractual context to signify a validation device. The term is used, rather, more as an interpretation device." ***Curran v. Children's Serv. Ctr. of Wyoming Cnty., Inc.***, 578 A.2d

8, 11 (Pa.Super. 1990) (citation omitted). "Substantial hardship" has been found in cases where an employee left his former job, sold his house, or relocated for employment. *Donahue*, 753 A.2d at 245; *Marsh v. Boyle*, 530 A.2d 491, 494 (Pa.Super. 1987); *Permenter v. Crown Cork & Seal Co.*, 38 F.Supp. 2d 372, 379 (E.D. Pa. 1999) (applying Pennsylvania law). For example,

> in *Cashdollar* [*v. Mercy Hospital of Pittsburgh*, 595 A.2d 70, 73 (Pa.Super. 1991)], we found sufficient additional consideration where the employee, in response to the employer's persistent recruitment efforts, gave up a stable position in another state, sold his house, and relocated to a new city with his pregnant wife, only to be fired after sixteen days on the job. *Id.* On the other hand, our Courts have found no additional consideration where the employee "has suffered detriments, in the course of his or her employment, that are 'commensurate with those incurred by all manner of salaried professionals.'" *Id.*, citing *Veno v. Meredith*, 357 Pa.Super. 85, 515 A.2d 571, 580 (1986) (no additional consideration when employee was fired after eight years over a difference of opinion with his employer, even though employee had originally moved from Newark to Pennsylvania and had foregone other employment opportunities over the years)[.]

*Donahue*, 753 A.2d at 245.

Further, a general allegation of superior work performance by an employee is not a "substantial benefit" to the employer and thus insufficient to establish additional consideration. *Id.* This is so because performing well on the job does not generally confer a substantial benefit on the employer beyond what is expected of the employee, nor a detriment "beyond that which is incurred by all manner of salaried professionals." *Id.* Although the

determination of whether there is sufficient additional consideration to overcome the at-will presumption is typically a question for a jury, the discharged employee "must first present averments which would raise a legally sufficient factual dispute" concerning the existence of such additional consideration. ***Rapagnani v. Judas Co.***, 736 A.2d 666, 671 (Pa.Super. 1999) (citation omitted). The court may then decide whether the additional consideration was sufficient to overcome the at-will presumption. ***Id.***; ***see also Permenter***, 38 F.Supp. 2d at 379.

Here, Giordano did not render additional consideration sufficient to overcome the at-will presumption. He alleges no facts analogous to those in which courts have found sufficient to give rise to an implied contract of employment. He does not allege that he moved or relocated, sold his house, or gave up another job. Giordano's additional duties during the pandemic were a detriment commensurate with that incurred by all manner of salaried professionals. ***Donahue***, 753 A.2d at 245. His allegations of undergoing a substantial hardship and furnishing a substantial benefit to Ashfield are insufficient to constitute sufficient additional consideration as a matter of law to support his breach of implied contract claim. Thus, the court did not err in sustaining Ashfield's preliminary objections and dismissing Counts II and IV of the amended complaint.

In his third issue, Giordano argues that the trial court erred in dismissing Count VII for breach of the duty of good faith and fair dealing and Count XI for unjust enrichment. We will address each count separately.

Giordano argues that he sufficiently pled a claim for breach of the duty of good faith and fair dealing. He alleges that Ashfield breached its duty of good faith and fair dealing by coercing his labor servitude, taking and restraining his real and personal property, and coercing his debt and a debtor-creditor relationship. Giordano's Br. at 45. Giordano further claims that "Ashfield breached its duty of good faith and fair dealing when it terminated his employment without cause after Ashfield had coerced and induced his implied contract for employment for a reasonable period of time." *Id.* at 46.

"Every contract imposes on each party a duty of good faith and fair dealing in its performance and its enforcement." *Kaplan v. Cablevision of Pa., Inc.*, 671 A.2d 716, 722 (Pa.Super. 1996) (*en banc*) (quoting Restatement (Second) of Contracts, § 205). However, a plaintiff "cannot as a matter of law maintain an action for breach of the implied duty of good faith and fair dealing, insofar as the underlying claim is for termination of an at-will employment relationship." *Donahue*, 753 A.2d at 243. As previously stated, Giordano was an at-will employee. Even in the absence of an at-will employment agreement, an action for the implied covenant of good faith and fair dealing is not cognizable as an independent cause of action under Pennsylvania law as it is subsumed in a breach of contract action. *LSI Title Agency, Inc. v. Evaluation Servs.*, 951 A.2d 384, 391, 392 (Pa.Super. 2008). Accordingly, the trial court did not err in dismissing Count VII.

Giordano next maintains that he sufficiently pled a cause of action for unjust enrichment in Count XI. He argues that his claim for unjust enrichment

is based upon an implied contract in which he conferred a benefit on Ashfield to his detriment without any corresponding exchange of value. Giordano's Br. at 49.

An unjust enrichment claim arises from a quasi-contract. **_Toppy v. Passage Bio, Inc._**, 285 A.3d 672, 687 (Pa.Super. 2022). "A quasi-contract imposes a duty, not as a result of any agreement, whether express or implied, but in spite of the absence of an agreement, when one party receives unjust enrichment at the expense of another." **_Id._** (citation omitted). "The elements of unjust enrichment are benefits conferred on defendant by plaintiff, appreciation of such benefits by defendant, and acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." **_Id._** (citation omitted).

Here, Giordano concedes that Ashfield fully reimbursed him for any alleged credit card debt before he was terminated. **_See_** Am. Compl. at ¶ 85. There are no other allegations in the amended complaint that Ashfield retained any other compensable benefit from Giordano. Accordingly, his claim for unjust enrichment fails.

In his final issue, Giordano argues that the court erred in dismissing Count VIII for invasion of privacy, Count IX for private nuisance, and Count X for civil theft for conversion. We will address each count in turn.

Giordano argues that he sufficiently pled a cause of action for the tort of invasion of privacy based on intrusion upon seclusion. **_Id._** at 51. He

maintains that "Ashfield's invasion of [his] personal private property and residence, his financial security, cash and freedom to live free from coercion amounts to an intrusion upon seclusion and solitude of [his] private property and affairs and concerns." *Id.* at 53. Giordano alleges that these actions "would be highly offensive to a reasonable person in the community, and [he] suffered harm and damages." *Id.*

An intrusion upon seclusion occurs when one "intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person." Restatement (Second) of Torts § 652B. The invasion may be by physical intrusion into a place where the plaintiff has secluded himself, by use of the defendant's senses to oversee or overhear the plaintiff's private affairs, or some other form of investigation or examination into plaintiff's private concerns. *Id.* at § 652B, Comment b. To state a cause of action for this tort, "a plaintiff must aver that there was an intentional intrusion on the seclusion of their private concerns which was substantial and highly offensive to a reasonable person, and aver sufficient facts to establish that the information disclosed would have caused mental suffering, shame or humiliation to a person of ordinary sensibilities." *Pro Golf Mfg., Inc. v. Tribune Review Newspaper Co.*, 809 A.2d 243, 247 (Pa. 2002). There must be "an intentional and unwarranted acquisition by the defendant[.]" *Burger v. Blair Med. Assocs., Inc.*, 964 A.2d 374, 379 (Pa. 2009).

Here, the allegations in Giordano's amended complaint fail to state a claim for intrusion upon seclusion. For Giordano's claim to be sufficient, there must be specific averments that Ashfield's alleged intrusion was so substantial and offensive that it caused mental suffering, shame or humiliation to a person of ordinary sensibilities. **Pro Golf Mfg.**, 809 A.2d at 247. The amended complaint is devoid of any such allegations. Nor does it allege that Ashfield intentionally acquired private information about Giordano. Giordano's claim is that he was forced to use his residence to store Ashfield's equipment and use his own money to purchase equipment. Those allegations do not constitute an intrusion so substantial that would be considered highly offensive to a reasonable person. Giordano thus did not state a claim under this theory, and the court did not err in dismissing this count.[2]

Giordano next argues the court erred in finding that he failed to establish a cause of action for private nuisance. He alleges that "Ashfield's unlawful actions and conduct was the direct and proximate cause of the intentional private nuisance against [his] interest in his private land and property." Giordano's Br. at 57. He further claims that "[t]he nuisance against Giordano amounted to a real and appreciable interference with Giordano's use and

---

[2] The trial court dismissed this claim, and Giordano's other tort claims, on other grounds. However, this Court may affirm the decision of the trial court if it is correct on any grounds and supported by the record on appeal. **See Liberty Mut. Ins. Co. v. Domtar Paper Co.**, 77 A.3d 1282, 1286 (Pa.Super. 2013).

enjoyment of his private property and land, and the harm was significant."

*Id.* at 58.

Restatement (Second) of Torts § 822 contains the authoritative definition of a private nuisance. *See Karpiak v. Russo*, 676 A.2d 270, 272 (Pa.Super. 1996). Section 822 provides:

> § 822. General Rule
>
> One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either
>
> > (a) intentional and unreasonable, or
> >
> > (b) unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.

Restatement (Second) of Torts § 822 (1979).

A defendant is not subject to liability for an invasion unless the invasion caused "significant harm," which is defined as a harm "of a kind that would be suffered by a normal person in the community or by property in normal condition and used for a normal purpose." *Id.* at § 821F. The Comment to Section 821F further explains:

> By significant harm is meant harm of importance, involving more than slight inconvenience or petty annoyance. The law does not concern itself with trifles, and therefore there must be a real and appreciable invasion of the plaintiff's interests before he can have an action for either a public or a private nuisance . . . [I]n the case of a private nuisance, there must be a real and appreciable

interference with the plaintiff's use or enjoyment of his land before he can have a cause of action. . . .

When [the invasion] involves only personal discomfort or annoyance, it is sometimes difficult to determine whether the invasion is significant. The standard for the determination of significant character is the standard of normal persons or property in the particular locality. If normal persons living in the community would regard the invasion in question as definitely offensive, seriously annoying or intolerable, then the invasion is significant.

*Id.* at § 821F, Comments c, d.

Here, the harm Giordano allegedly suffered – his employer's temporary use of a portion of his property – does not rise to the level of significant harm that is required for a claim of a private nuisance. As such, the court did not err in dismissing this claim.

Lastly, Giordano argues that the court erred in dismissing his claim for conversion. He asserts that Ashfield's actions "converted to its own use, benefit and enjoyment Giordano's rights and interest in his real and personal property." Giordano's Br. at 60-61.

Conversion is "the deprivation of another's right of property in, or use or possession of, a chattel, or other interference therewith, without the owner's consent and without lawful justification." ***Spector Gadon & Rosen, P.C. v. Rudinski, Orso & Lynch***, 231 A.3d 923, 925 (Pa.Super. 2020) (citation omitted).

Giordano failed to state a claim for conversion. He alleges that his rights to his property were converted when Ashfield, without permission, forced him to store equipment there and incur personal debt. However, Giordano was

always in control of his property and could use his property as he wished. In fact, he alleges that at the end of 2020, he voluntarily packed up the equipment and personally drove it to Ashfield's Fort Washington office. ***See*** Am. Compl. at ¶ 88. Likewise, there was no allegation that Ashfield used his credit card without his consent. The court did not err in dismissing this claim.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 7/16/2025